UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Lonnie BLACKWELL, <br> *Plaintiff,* <br> *v.* <br> CITY OF BRIDGEPORT, <br> *Defendant.* | Civil No. 3:15-cv-0046 (JBA) <br><br> February 27, 2017 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Lieutenant Lonnie Blackwell ("Lt. Blackwell" or "Plaintiff") brings this action against his employer, the Bridgeport Police Department ("BPD" or "Defendant"), alleging discrimination on the basis of race and unlawful retaliation in violation of Title VII and 42 U.S.C. § 1981 and seeking declaratory or injunctive relief in addition to compensatory and punitive damages.

Defendant Bridgeport Police Department ("BPD") now moves [Doc. # 31] for summary judgment on the entirety of Plaintiff's complaint, claiming that there is no genuine issue of material fact that Defendant's actions did not create or tolerate a hostile work environment and that Defendant in any case has legitimate non-discriminatory reasons for its actions. Similarly, Defendant asserts that there is no genuine issue of material fact that its actions were not retaliatory. For the reasons discussed below, the Court DENIES Defendant's motion for summary judgment with respect to Plaintiff's hostile work environment claim under Title VII and § 1981, and GRANTS Defendant's motion for summary judgment on the claims of unlawful retaliation.

**I.  Facts**

Plaintiff Lonnie Blackwell is a member of the Bridgeport Police Department who has risen through the ranks to become lieutenant and Officer in Charge of the BPD's Training Academy. (Defendant's Local Rule 56a(1) Statement [Doc. # 31-2] at ¶¶ 4-6 ("56a(1) Stmt."); Plaintiff's Local

Rule 56a(2) Statement [Doc. # 41] ¶¶ 4-6 ("56a(2) Stmt.")). Lt. Blackwell began his career at the Bridgeport Police Department in November, 2000 when he was hired as a police officer., Ex. 1 ("Blackwell Aff.") to Pl.'s Mem. Opp'n. [Doc. # 40-1] ¶ 5. In 2006, after six years on the force, he was promoted to Sergeant and in 2008 he was promoted to Lieutenant. (*Id.*) In January, 2009, he was appointed to the position of Officer in Charge of the Training Academy. (*Id.* at ¶ 9.) Since 2010, Lt. Blackwell has been president of the Bridgeport Guardians, an organization comprised of minority police officers whose mission is to combat employment discrimination in the Bridgeport Police Department. (Blackwell Aff. ¶ 12.) Lt. Blackwell is African-American and black. (*Id.* ¶ 1.)

The events giving rise to Lt. Blackwell's lawsuit began on March 26, 2012, when an anonymous letter dated March 3, 2012 and purporting to be authored by multiple "Concerned Officers" was distributed throughout the BPD. (*See* Ex. A ("2012 Anonymous Letter ") to Gaudett Aff. [Doc. # 31-11].) The letter was addressed to Chief of Police Joseph Gaudett and voiced complaints about Lt. Blackwell, focusing primarily on his compensation and his apparent permission to drive a police car home every day.

Because this one-page letter grounds the discrimination and retaliation claim, it will be quoted at length. In pertinent part, it reads:

> Chief Gaudett, This letter is being written to you after we've received numerous complaints regarding the freedom you have allowed Lonnie Blackwell. . . . First and foremost is his salary/overtime over the past several years. $125,000 in 2009, $152,000 in 2010, and now $168,000 in 2011. What other Lt. writes his own overtime like this? . . . How could YOU allow this to happen under your watch? The talk amongst officers is that he has an open checkbook to write whatever overtime he wants. . . . Most Patrol Lt.s salary and overtime combined do not even match Blackwell's overtime alone. . . . An element of larceny 1st is the property is obtained by defrauding a public community!!!!!!!!!!! We are supposed to fight criminal activity, not allow it. . . . He is one of the few people who still takes a car home every night. Did we not end the take home car policy? That white S.U.V. is in Milford

almost every night. . . . Blackwell is known to never be at the academy while either out meeting with retired/current Guardian members. All this to further his race hustle as President of the Guardians. Do you as Chief of Police allow this to happen in order to appear as if you have solved the racial woes of the Department? . . . At what point are we done paying for Remedy? The tide has turned and now you have numerous unhappy white officers among your ranks. Do you even care? Blackwell will use you and then spit you out the second he no longer needs you, while calling you a racist. He's known as Blackhell for a reason. . . . Initial discussions have surfaced about forming a white officers society to help protect ourselves against the abuses you have allowed to occur.

2012 Anonymous Letter.

The 2012 Anonymous Letter was discovered in the patrol room over the weekend of March 24-25, 2012. (Gaudett Aff. [Doc. 31-10] ¶ 10.) On Monday, March 26, 2012, Chief Gaudett had a copy of the letter sent to Lt. Blackwell and subsequently met with him to discuss its contents. (56a1 Stmt. ¶ 15.) Neither recalls the exact content of their discussion, although Lt. Blackwell testified that he "may have asked the Chief to try to eliminate the racism in the department." (Blackwell Tr. [Doc. # 31-4] at 29:5-7; 35:5-15.) According to Chief Gaudett, further copies of the 2012 letter were found one month later again distributed throughout the patrol room and police headquarters. (Gaudett Aff. ¶¶ 13-14.)

On March 26, 2012, the same morning he spoke to Plaintiff about the letters and the department's response, Chief Gaudett sent an email to Assistant City Attorney Arthur Laske and Lt. Rebecca Garcia, officer in charge of the Bridgeport Police Department's Office of Internal Affairs, requesting that Lt. Garcia "[p]lease open an investigation into [the letter's] authorship, etc." (Ex. B. to Gaudett Aff.) Lt. Garcia testified that she did try to track down the original copy of the letter but, despite the Chief's request, Lt. Garcia did not open an investigation. (Garcia Tr. [Doc. # 31-5] at 13:3-15:8.) In deposition, she explained that Chief Gaudett's email was not an

3

"official directive," and absent such official directive, she never opened an investigation. (Garcia Tr. at15:6-16:18.) Lt. Blackwell testified that no one from internal affairs followed up with him and no one from internal affairs checked on his safety. (Blackwell Tr. at 35:18-20.)

On March 27, 2012, Lt. Blackwell's immediate supervisor, Captain Robert Sapiro, sent an email to Deputy Chief James Baraja about the 2012 anonymous letter. He wrote:

> Lt. Blackwell is personally attacked in this racially charged letter. I am concerned regarding allegations that involve his daily whereabouts, his role as Guardian President, and the location of his residence. The name alteration to "Blackhell"; the reference to maligned races; and the need for protection from "abuses that you have allowed to occur" indicates someone feeling victimized, and frustrated with nowhere to turn. Intolerance and animosity expressed toward Lt Blackwell's race, and the Guardians, could foment an atmosphere of hostility toward Black officers in our department. Please advise if there is any policy adherence or any other matters I need to attend to regarding this situation.

(Ex. 1 ("Sapiro E-mail") to Pl.'s Opp'n. to Mot. Summary Judgment [Doc. # 40-2].)

A little more than a year later, a second anonymous letter surfaced, but instead of being distributed throughout the department, it was sent to Assistant Chief of Police James Nardozzi. For the most part, the letter focuses on Lt. Blackwell as an individual and attacks the chief of police for cowardice in failing to stand up to Lt. Blackwell's supposed abuses.

In pertinent part, the second letter reads:

Assistant Chief Nardozzi, We are now writing to you about Lt. Lonnie Blackwell in hopes that you will look into our claims. It is obvious that no high ranking member in the department will stand up for what is right . . . . Last year we wrote an unsigned letter to Chief Gaudett . . . hoping he would look into the issues mentioned. For obvious reasons, we could not sign it because retaliation would occur. Our understanding is one of the main reasons you were brought in was to fix the overtime. The simple solution to curtail the overtime issues in the department would be to cut back in patrol, but how about an audit of several other areas including the wasteful overtime Blackwell receives. You would think common sense would prevail that one Lt. who needs over $100,000 in overtime should be replaced

with a more competent person. . . . Just take a look at the pay he received over the last four years ($607,000) and with a clear head tell us if you think that's appropriate. Of course it's not. This get rich quick scheme that Blackwell is performing occurs while Captain Sapiro runs interference for him. . . . How arrogant that the biggest single abuser of overtime in the department shows up late for a mandatory meeting to discuss overtime!!! . . . . The Guardian hush money he receives from the Chief is the dirty little secret nobody wants to talk about. . . . [Quoting Chief Gaudett from an interview:] 'Our officers are held to high standards and rightfully so, and we intend to maintain these high standards.' Doesn't this also apply to a Lt. committing Larceny and Fraud? . . . The Guardian study sessions that Blackwell was conducting on company time we find especially interesting. After it was agreed upon by Chief Gaudett that promotional exams would require five years of service, Blackwell convinced David Dunne (Civil Service) to have it remain the way it currently is so that his cronies in the Guardians would be eligible to take the exam. He obviously doesn't want the best qualified candidates, just the right color. He would make the circus proud of the clown school he is running. . . .

(Ex. D ("2013 Anonymous Letter") to Gaudett Aff. [Doc. # 31-11].)

On April 18, 2013, several weeks after this letter arrived, Lt. Blackwell emailed Chief Gaudett and Deputy Chief Nardozzi, copying Captain Sapiro, to complain about the letter, noting that he was "once again the target of rampant harassment and humiliation with multiple letters surfacing around the department." (Ex. 38 ("2013 Blackwell E-mail ") to Pl.'s Mem. Opp'n. [Doc. # 40-9].) In this e-mail, Lt. Blackwell discussed what he perceived to be a "culture of hatred and discrimination" in his workplace and concluded by requesting an investigation: ". . . let's actually attempt to locate the culprit(s) for once." (*Id.*)

Also on April 18, 2013 Captain Sapiro wrote to his superiors, alerting them to the content of the second letter and encouraging them to open an investigation. He noted that this letter was "disparaging" and that "the reference and connection to last year's letter which I thought was racist" was problematic. (Ex. 27 ("2013 Sapiro E-mail ") to Pl.'s Mem. Opp'n. [Doc. # 40-7].) Captain Sapiro closed his letter by stating that "it could be very difficult [to determine the origin

of the letter] but there is always a chance that someone may know something and be willing to come forward. But we will never know if no investigation takes place. If nothing is attempted, there is nothing to discourage this type of behavior from continuing." (*Id.*)

The parties agree that the letter was not tested for fingerprints and that no investigation was conducted by the Office of Internal Affairs into to 2013 letter. (Def.'s 56a(1) Stmt. ¶¶ 33-34. Pl.'s 56a(2) Stmt. ¶¶ 33-34.) The record does not reflect any attempt on the part of Defendant to address the letters within the police department in any fashion.

In the time period after those letters circulated in the department and Lt. Blackwell complained about them, the department began to restrict some of the perquisites that Lt. Blackwell had previously enjoyed, including generous overtime and use of a take-home car. The record reflects a steady reduction in overtime beginning in early 2013 (*see e.g.* Ex. 6 to Pl.'s Mem. Opp'n. [Doc. # 40-3] (documenting denial of overtime during February 2013); Ex. 7 to Pl.'s Mem. Opp'n. [Doc. # 40-3] (documenting failure to pay Plaintiff for overtime worked during December 2013); Ex. 8 to Pl.'s Mem. Opp'n. [Doc. # 40-3] (documenting alleged loss of Plaintiff's timesheets during February, 2014)), but the record does not reflect the date on which vehicle take-home privileges were rescinded. In addition, Lt. Blackwell's superiors took over the task of determining which officers would lead training courses despite the fact that Lt. Blackwell was nominally the Officer in Charge of the Training Academy. (Ex. 21 to Pl.'s Mem. Opp'n. [Doc. # 40-6] (indicating that the Chief had removed "POST C certification approval" from Lt. Blackwell's office to his own).) Lt. Blackwell groups these changes in the conditions of his employment into six categories.

First, some of the discretion Lt. Blackwell exercised to assign training duties to particular officers within the Training Academy was curtailed. The record does not clarify whether the official authority to assign teaching duties lay with Captain Sapiro or Lieutenant Blackwell. While the

Chief of Police is ultimately responsible for all work assignments within the department (56a(1) Stmt. ¶ 62; 56a(2) Stmt. ¶ 62), the commanding officer of the Training Division is responsible for the training function of the Bridgeport Police Department (Gaudett Aff. ¶¶ 27 – 29). The BPD Policy and Procedure Manual clarifies that "[a]ll training and training-related activities shall be coordinated through the Commanding Officer of the Training Division," including planning training programs and selecting instructors. (Ex. F. to Gaudett Aff.) According to Chief Gaudett, Lt. Blackwell was the "head of training" at the Bridgeport Police Department. (Gaudett Aff. ¶ 6.)[1]

Despite this delegation of authority for selecting instructors, Chief Gaudett personally assigned responsibility for leading the Cooper fitness training class to Sergeant Collazo in the summer of 2013. (56a(1) Stmt. ¶¶ 70-71; 56a(2) Stmt. ¶¶ 70-71.) When the department shifted from one kind of revolver to another, Deputy Chief Armeno, who is in charge of firearms at BPD, selected Lt. Gilleran to lead the training. (56a(1) Stmt. ¶ 79; 56a(2) Stmt. ¶ 79.) While the parties agree that in-service training classes for the evening and over-night shifts were moved from the training academy to police headquarters, they disagree vehemently about the reasons for this move; whereas Defendant argues that the move produced a significant reduction in overtime, Plaintiff asserts that the move was motivated by a desire to further strip Plaintiff of responsibilities. (56a(1) Stmt. ¶¶ 88-90; 56a(2) Stmt. ¶¶ 88-90.) Finally, Assistant Chief Nardozzi selected Lt. Straubel to lead an orientation program for new sergeants. (56a(1) Stmt. ¶¶ 94-96; 56a(2) Stmt. ¶¶ 94-96.)

---

[1] Because the relationship between "Commanding Officer," "Officer in Charge," and "head of training" is not clarified by the record, the Court will construe this ambiguity in a light most favorable to the non-moving party and assume that Lieutenant Blackwell had the authority and discretion to select instructors.

Second, Lt. Blackwell's permission to work overtime was restricted, thereby causing a reduction in his overall compensation. (*See* Def.'s Rule 56a(1) Stmt. ¶¶ 56-57 (noting approximately 56% reduction in overtime from 2012 to 2013); Pl.'s Rule 56a(2) Stmt. ¶¶ 56-57.) The parties agree that Assistant Chief Nardozzi was hired to "substantially reduce overtime and other costs throughout the Bridgeport Police Department." (56a(1) Stmt. ¶ 40; 56a(2) Stmt. ¶ 40.) Lt. Blackwell admits that Assistant Chief Nardozzi reduced overtime "overall" starting in 2013. (Blackwell Tr. at 84:12-16.) However, Lt. Blackwell asserts that the reductions were uneven and that "some divisions . . . earned substantial amounts of overtime and . . . some divisions were not allowed to work overtime." (Blackwell Tr. at 84:8-11.)

The record contains a series of e-mails documenting reductions to Plaintiff's overtime (Exs. 9-18 to Pl.'s Mem. Opp'n.) and another series raising questions about inexplicably lost or misplaced timesheets recording overtime (Exs. 7-8 to Pl.'s Mem. Opp'n.). These e-mails document denial of Plaintiff's requests to work overtime on many occasions from 2013-2014. However, they also indicate that Plaintiff's supervisor, Captain Sapiro, was denied permission to work overtime as well. For example, on August 27, 2013, Captain Sapiro wrote to Lt. Blackwell, "[Deputy Chief Baraja] did protest on the division's expenditures. I explained that we turned in only 4-5 hours for the entire summer. I wrote an email explaining my lack of resources. He seems to believe we can get by." (Ex. 12 to Pl.'s Mem. Opp'n. [Doc. # 40-4].) Likewise, Captain Sapiro explained that he worked overtime without compensation:

> As I have made you aware, since the summer I have worked anywhere from five to ten hours a week for in house comp time, or not even recorded, that I may or may not ever use. I felt this was my only option in order to complete tasks that I believed were important and were expected to be completed.

Ex. 15 to Pl.'s Mem. Opp'n. [Doc. # 40-4].

8

Defendant gives reasons for these curtailments of overtime, explaining that "in 2011, the Bridgeport Police Department took steps to try to reduce overtime. As a result, many police officers had their overtime pay reduced. Departmental-wide cuts in overtime and other cuts continued to be made in 2012 and 2013." (Gaudett Aff, ¶ 11.)

> When James Nardozzi was hired at the end of November 2012 to be the Assistant Chief, his principal charge was to substantially reduce overtime and other costs throughout the Bridgeport Police Department. In early 2013, Assistant Chief Nardozzi began cutting overtime across the board. In order to evaluate the need for overtime, Assistant Chief Nardozzi, with my knowledge and approval, instituted a policy that all overtime requests be sent to him for individual review and approval or disapproval. During 2013, Assistant Chief Nardozzi denied numerous overtime requests from all departments and divisions.

(*Id.* ¶¶ 74-75.)

Lt. Blackwell asserts that Assistant Chief Nardozzi and Chief Gaudett circumvented policy that granted discretion to assign overtime to Captain Sapiro in order to target Lt. Blackwell specifically.[2] (56a(2) Stmt. ¶ 49.) Defendant agrees that Assistant Chief Nardozzi took away Captain Sapiro's discretion to assign overtime, but asserts that this was done because Nardozzi found Captain Sapiro's decisions regarding overtime assignment to be unsound. (Def.'s 56a(1) Stmt. ¶ 49.) When Assistant Chief Nardozzi took away Captain Sapiro's oversight of Lt. Blackwell, he delegated that responsibility to Deputy Chief Baraja, whose relationship with Plaintiff was strained. Defendant admits that Deputy Chief Baraja does not say hello to the plaintiff and does

---

[2] Exs. 7-18 to Pl.'s Mem. Opp'n. Somewhat in tension with this claim, Plaintiff also argues that Captain Sapiro never had *de facto* discretion to assign overtime. *See, e.g.* Ex. 14 to Pl.'s Mem. Opp'n. (Captain Sapiro states that overtime is prohibited for "administrative tasks associated with training"), Ex. 15 to Pl.'s Mem. Opp'n. (Captain Sapiro clarifies that "[w]e are now, as of November 27th, enabled to use overtime as required for class #36 preparation.").

not "interact or communicate with him except professionally on an as-needed basis." (56a(1) Stmt. ¶ 52.)

Third, Lt. Blackwell's permission to use a so-called "take-home" car was revoked. The department changed its policy on take-home vehicles in June 2011 for budgetary reasons. (56a(1) Stmt. ¶ 99; 56a(2) Stmt. ¶ 99.) Despite this official change, "a number of officers" continued to use take-home vehicles until 2013, when Assistant Chief Nardozzi revoked take-home privileges for many officers, including several Captains, several Lieutenants, and several Sergeants. (56a(1) Stmt. ¶¶ 101-105; 56a(2) Stmt. ¶¶ 101-105.) The parties agree, for purposes of summary judgment, that take-home privileges were revoked for white, Hispanic and African-American officers. (*Id.*)

Fourth, Lt. Blackwell's application to sit on the firearms discharge review board, which he submitted in March 2013, was rejected. (56a(1) Stmt. ¶ 127; Armeno Aff. [Doc. # 31-7] ¶ 8.) The review board is an ad hoc committee whose purpose is to review any instance in which an officer fires his or her weapon that is formed of seven or eight officers drawn from the various ranks with one slot for a lieutenant. (56a(1) Stmt. ¶¶ 117-119.) Several months later, on July 10, 2013, Captain Roderick Porter, an African American, wrote to Assistant Chief Nardozzi requesting to serve on the committee. (*Id.* ¶ 121.) He also pointed out the lack of diversity on the committee at that time. (*Id.* ¶ 123.) In response, Assistant Chief Nardozzi called Deputy Chief Armeno and asked that Captain Porter be placed on the committee.

Fifth and sixth, Plaintiff alleges that the Bridgeport Police Department (i) failed to denounce or otherwise publicly address the anonymous letters and (ii) failed to investigate the origin or authorship of the letters. Defendant responds that it gave an unofficial directive to Lieutenant Garcia of the Office of Internal Affairs to investigate the letter, but that she did nothing beyond contact a person who mistakenly believed she had found the original letter in a

photocopier. Defendant concedes that no fingerprinting was done of the 2013 letter and that no investigation was conducted by the OIA into the 2013 letter.

Plaintiff contrasts this failure to investigate the letters with the immediate investigation that was conducted in March 2014 after Lieutenant Brian Fitzgerald complained to Deputy Chief Baraja that he overheard Lt. Blackwell speak loudly about his intention to assault Lt. Fitzgerald. (56a(1) Stmt. ¶ 37; 56a(2) Stmt. ¶ 37.) Deputy Chief Baraja, considering this to be a threat of workplace violence, conducted an immediate investigation during which two witnesses in the room with Lt. Blackwell stated that they had heard no such threat. (Baraja Aff. ¶ 4.) Deputy Chief Baraja concluded that Lt. Fitzgerald must have been mistaken and did not report the incident to the Office of Internal Affairs. (56a(1) Stmt. ¶¶ 38-39; 56a(2) Stmt. ¶¶ 38-39.)

## II. Discussion[3]

Plaintiff asserts that he has been subjected to (i) unlawful discrimination on the basis of his race and color in violation of Title VII, (ii) unlawful retaliation on the basis of his race and color in violation of Title VII, and (iii) unlawful discrimination and retaliation on the basis of his race

---

[3] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

and color in violation of 42 U.S.C. § 1981. At oral argument, Plaintiff clarified that his discrimination claims rest solely on a theory of hostile work environment. Defendant moves for summary judgment on all counts.

Title VII prohibits an employer from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Claims of racial discrimination under Title VII and § 1981 are assessed using the same substantive standards and burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) ("The substantive standards applicable to claims of employment discrimination under Title VII . . . are also generally applicable to claims of employment discrimination brought under § 1981"); *see also Fenner v. News Corp.*, No. 09-civ-09832 (LGS), 2013 WL 6244156 at \*12 (S.D.N.Y. Dec. 2, 2013)(standards same for hostile work environment under Title VII and § 1981).

**A.  Timeliness of Complaint**

"Before a plaintiff may bring a Title VII action in federal court, he must exhaust his administrative remedies by filing a timely charge with the Equal Employment Opportunity Commission ("EEOC"). *See* 42 U.S.C. § 2000e–5(e)(1), (f)(1); 29 U.S.C. § 626(d); 42 U.S.C. § 12117(a). "[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Francis v. City of New York,* 235 F.3d 763, 767 (2d Cir. 2000), quoting *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, (1982) (internal quotations omitted). A complainant must file with the EEOC within 180 days after the alleged discriminatory act occurred; if he has already filed the charge with a state or local agency that monitors fair

employment practices, he must file his EEOC charge within 300 days of the alleged discriminatory act. 42 U.S.C. § 2000e–5(e)(1). *See Falso v. Gates Chili Cent. Sch. Dist.*, 408 F. App'x 494, 495 (2d Cir. 2011).

Defendant urges that the complaint was not timely brought because Plaintiff filed his EEOC complaint on August 20, 2013, more than 300 days after becoming aware of the 2012 anonymous letter. In the alternative, Defendant argues that Plaintiff may not raise any hostile work environment claim predicated on this letter because of the timing of Plaintiff's complaint. (Def.'s Mem. Supp. Mot. Summary Judgment at 24.)

Plaintiff responds that his claims were raised not only under Title VII, but under 42 U.S.C. § 1981, which carries a three-year statute of limitations. (Pl.'s Mem. Opp'n. at 15.) *See Oyelola v. Hartford Fin. Servs. Grp., Inc.*, No. 3:12-CV-01685 JCH, 2014 WL 496880, at *8 (D. Conn. Feb. 5, 2014) ("[t]he statute of limitations for section 1981 claims is three years in Connecticut.) Thus, plaintiff's § 1981 claims are timely.

Further, Plaintiff argues that BPD's failure to investigate the 2012 letter is the actual discriminatory act, not the letter itself, and that Defendant's failure to investigate contributed to a hostile work environment. (Pl.'s Mem. Opp'n. at 18.) Plaintiff and Defendant agree that controlling Supreme Court precedent permits hostile work environment claims under Title VII to proceed where at least one of the discriminatory acts falls within the limitations period.[4] Here, almost all

---

[4] Both parties rely on *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), which holds in pertinent part that:

> It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff

actions alleged, with the exception of the 2012 letter and potentially some of the teaching reassignments occurred within the limitations period.

The second letter, which Defendant concedes is not time-barred, makes explicit reference to the first and appears to attach it: "[L]ast year we wrote an unsigned letter to Chief Gaudett (see attached) hoping he would look into the issues mentioned. . . ." 2013 Anonymous Letter. Simply by dint of attaching it, the 2012 Anonymous Letter is properly a part of the summary judgment record. Moreover, by referencing the 2012 Anonymous Letter, the 2013 Anonymous Letter demonstrates how the two letters build on each other in contributing to the claimed hostile work environment.

### B. Hostile Work Environment

An employee may suffer discriminatory treatment in violation of Title VII if he is required to work in a hostile or abusive environment. *See Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001) To prevail on this theory, a plaintiff must prove (a) that he subjectively perceived the environment to be abusive; (b) that his working environment was "objectively hostile" and (c) that a specific

---

to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days after the single unlawful practice occurred. Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

*Id.* at 117-18.

basis exists for imputing the harassing conduct to the employer. *See Howley v. Town of Stratford,* 217 F.3d 141, 153–54 (2d Cir. 2000).

An objectively hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). Conduct that is "merely offensive," and "not severe or pervasive enough to create an objectively hostile or abusive work environment [meaning] an environment that a reasonable person would find hostile or abusive [ ] is beyond Title VII's purview." *Id.* Relevant considerations for assessing a hostile work environment claim include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23 (*cited in Pucino v. Verizon Wireless Communications, Inc.,* 618 F.3d 112, 119 (2d Cir. 2010)).

There is little case law involving anonymous, infrequent letters claimed to create a hostile environment on their own. In *Butler v. Ysleta Independent School District,* the Fifth Circuit held that anonymous letters containing sexual innuendo and sent infrequently to two women's homes did not constitute a hostile environment because they were not frequent, lacked severity because they were not made public, were not threatening, and did not interfere unreasonably with a person's work performance. *Butler v. Ysleta Independent School District,* 161 F.3d 263, 269-70 (5th Cir. 1998).

Defendant argues that the anonymous letters here were neither severe enough nor pervasive enough to create a hostile work environment and that the purportedly adverse

employment actions, even together with the anonymous letters, were insufficient to show that Lt. Blackwell's working conditions had been altered. (Def.'s Mem. Supp. at 25.)

Plaintiff contends that the two letters, although spaced a year apart, "formed a pattern of harassing conduct that, despite Chief Gaudett's insistence to the contrary, specifically targeted the plaintiff." (Pl.'s Mem. Opp'n at 26.) Further, "the defendant's failure to investigate the plaintiff's complaints of harassment is the type of discrimination which is considered to be within the scope of Title VII." (*Id.* at 27.)

Measured against the four *Harris* criteria (frequency, severity, presence of threat, and interference in workplace performance), the anonymous letters potentially contribute more to the creation of a hostile work environment than the letters at issue in *Butler*. First, although there were only two anonymous letters, they comprised more than just two discrete, infrequent acts, since the first letter was duplicated and distributed throughout the department on at least two occasions a month apart. The second letter, while not distributed throughout the department, was sent to Lt. Blackwell's supervisor.

In addition, the letters at issue here were more severe than those in *Butler*. In *Butler*, the letters were sent to the employees' homes, not made public, and did not directly address the employees' work. As the *Butler* court noted, public circulation or display would make the letters more severe because it would "demonstrate a communal effort to define who is welcome in the workplace." *Butler,* 161 F.3d at 269. Here, the letters targeting Lt. Blackwell were either publicly distributed throughout his workplace (the 2012 Anonymous Letter) or sent to his supervisor (the 2013 Anonymous Letter), called into question his competence, accused him of fraudulently billing for overtime, and charged him with conducting a "race hustle." The threat to organize against Plaintiff ("initial discussions have surfaced about forming a white officers society to help protect

ourselves against the abuses [Chief Gaudett has] allowed to occur") was directed to Plaintiff in his workplace; the letter directly attacked Lt. Blackwell's competence, tying this pejorative commentary directly to Lt. Blackwell's role as president of the Guardians, BPD's minority-officer organization. Moreover, the letters contain particular innuendo that a reasonable juror could find amounted to coded threats. In observing "that white SUV is in Milford almost every night," the authors of the first letter conveyed that someone was surveiling Plaintiff's home. 2012 Anonymous Letter.

Language need not be profane to be severe; cold and calculated denouncements seeking to ruin a career may be as successful as obscene tirades.[5] Copies of the first letter, widely disseminated

---

[5] A useful comparison can be drawn between the letters at issue here and the facts of *Howley v. Town of Stratford*, 217 F.3d 141 (2d Cir. 2000), in which a coworker delivered an obscenity-laced tirade at a union meeting. The Second Circuit found a single speech could suffice to create a hostile work environment where a speaker

> did not simply make a few offensive comments; nor did he air his views in private; nor were his comments merely obscene without an apparent connection to [plaintiff]'s ability to perform her job. Although [the speaker] made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which [plaintiff] was the only female and many of the men were her subordinates. And his verbal assault included charges that [plaintiff] had gained her office of lieutenant only by performing fellatio.

*Id.* at 154. This speech created a hostile work environment because it was public, tied issues of sex to work performance, and questioned the plaintiff's competence in front of her subordinates. In the instant case, although the letters are not obscenity-laden, they were targeted, articulate comments attacking Plaintiff, distributed throughout the department or sent directly to one of Plaintiff's superiors; and they attacked Plaintiff's competence, accusing him of defrauding the public and the department in his overtime requests and framing all of this in terms of Plaintiff's race, suggesting that he was protected and untouchable because he is black.

among Lt. Blackwell's subordinates, and the second sent to his superior, attacked his competence, integrity, and loyalty and potentially undermined his supervisory functioning in the workplace.

Both letters were infused with resentment cast in racial terms as interpreted by Captain Sapiro when he alerted his superiors to the first letter:

> Lt. Blackwell is personally attacked in this racially charged letter. I am concerned regarding allegations that involve his daily whereabouts, his role as Guardian President, and the location of his residence. The name alteration to "Blackhell"; the references to maligned races; and the need for protection from the "abuses that you have allowed to occur" indicates someone feeling victimized, and frustrated with nowhere to turn. Intolerance and animosity expressed toward Lt. Blackwell's race, and the Guardians, could foment an atmosphere of hostility toward Black officers in our department.

(Sapiro Letter.) A jury could similarly find that these letters were sufficiently severe to contribute significantly to a hostile work environment.

Further, the hostile work environment Plaintiff claims is not based solely on the letters, but on the totality of circumstances that make up the working environment and atmosphere at BPD, including, importantly, BPD's top management's complete inaction, argued to demonstrate its attitude toward racial harassment. Defendant opposes Plaintiff's focus on failure to investigate or to respond to the letters, maintaining that the failure to investigate is only part of the inquiry establishing liability and not a contributing factor to the hostile work environment itself.

While employer liability can be established by showing that the employer failed to respond, it does not follow that an employer's lack of response may not also be part of the unlawful hostile environment itself. The law is clear that "an employer may not stand by and allow an employee to be subjected to a course of racial harassment by co-workers" or supervisors. *Torres v. Pisano*, 116 F.3d 625, 636 (2d Cir. 1997). Thus, an employer's attitude, manifested through its actions and inactions, constitutes part of the work environment and the BPD's failure to investigate or

denounce the letters may be considered by a jury as contributing to the overall environment in which Lt. Blackwell worked.

Since the gravamen of Plaintiff's hostile work environment claim lies in these two anonymous letters and BPD's failure to respond to them or otherwise investigate their provenance and a reasonable jury could interpret the letters and BPD's responses as sufficient to prove a claim for hostile work environment, Defendant has failed to show that there is no genuine issue of material fact regarding the hostile work environment discrimination claim under Title VII and § 1981.

### C.  Retaliation for Opposing Discrimination

#### 1.  Legal Standard

Title VII's anti-retaliation provision makes it unlawful "for an employer to discriminate against any . . . employee[ ] . . . because [that employee] opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). As interpreted by the Supreme Court, that provision makes acts unlawful when they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

"Retaliation claims under Title VII . . . are also analyzed under the *McDonnell Douglas* burden-shifting test." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010). In setting forth the prima facie case, a plaintiff's burden is *de minimis*, and if the plaintiff satisfies this initial burden, "a presumption of retaliation arises. The defendant must then articulate a legitimate, non-retaliatory reason for the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164-65 (2d Cir. 2010). Where the defendant successfully shows a legitimate, non-retaliatory reason, "the

presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* However, the Second Circuit has observed that under the *McDonnell-Douglass* framework, setting forth a prima facie case for retaliation "tend[s] to collapse as a practical matter" into analysis of the later requirement that the plaintiff show the legitimate reason to be mere pretext. *Collins v. N.Y. City Transit Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002); *see also Wilson v. Emhart Teknologies LLC*, 566 F. Supp. 2d 120, 125 n.5 (D. Conn. 2008)(observing that a jury cannot infer discrimination from thin air and that even where a plaintiff "nominally" meets each of the prima facie requirements, this showing must also be enough to support inference of retaliation.)

To establish a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks*, 593 F.3d at 164. Some discussion of the third and fourth elements is necessary because the scope of "adverse employment action" is broader for retaliation claims than for substantive discrimination claims and because causation can be established by circumstantial evidence.

Under Supreme Court and Second Circuit precedent, "adverse employment action" in the context of retaliation encompasses a broader range of actions than merely those that affect the terms and conditions of a complainant's employment:

> The language of the substantive provision differs from that of the antiretaliation provision in important ways. . . . [By use of words like 'hire,' 'discharge,' 'compensation,' 'terms,' 'conditions' or 'privileges of employment'] the substantive provision . . . explicitly limit[s] the scope of that provision to actions that affect employment or alter the conditions of the workplace. No such limiting words appear in the antiretaliation provision.

*Burlington*, 548 U.S. at 62. The Second Circuit has recognized the broader scope of "adverse employment action" in the context of retaliation, noting that the central focus of analysis is "whether the employer's actions were harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 169 (interior citations and alterations omitted). For example, the Second Circuit has found that reasonable triers of fact could find an employee dissuaded from making complaints of discrimination if the employee feared transfer to a new location where he or she would no longer be allowed to perform broad discretionary and managerial functions, would lose reporting staff, and would be forced to perform work normally performed by clerical or lower-level personnel. *Kessler v. Westchester County Dep't. of Social Servs.*, 461 F.3d 199, 209-10 (2d Cir. 2006). Where multiple acts are claimed to constitute retaliation, the Second Circuit has instructed district courts to consider the acts both separately and "in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Hicks*, 593 F.3d at 165. (internal citations omitted.)

With respect to the fourth element of a prima facie case, causation, "[i]n this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) (internal citations and alterations omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Isaac v. City of N.Y.*, 701 F. Supp. 2d 477, 493 (S.D.N.Y. 2010).

Under the *McDonnell-Douglas* framework discussed above, a plaintiff overcomes an employer's proffered legitimate, non-discriminatory reason for its actions by bringing forth evidence that the purportedly legitimate reason is mere pretext and that a "substantial reason" for the discrimination for the adverse action was a discriminatory purpose. Cases that examine what constitutes a "substantial reason" have required more than a temporal proximity between protected activity and retaliation.

> Temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact.

*El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010); *accord Monachino v. Bair*, 481 F. App'x 20, 22 (2d Cir. 2012); *Simpson v. New York State Dep't. of Civil Servs.*, 166 Fed. App'x. 499, 501 (2d Cir. 2006); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 770 (2d Cir. 1998). However, a showing of a particularly "strong temporal connection" between protected activity and adverse employment action could support an inference that retaliatory purpose was a substantial reason and that the employer's legitimate reason was pretext. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 180 (2d Cir. 2005) (holding that an adverse employment action taken the same day, by an employer who was audibly enraged at the employee's engagement in protected activity, suffices to show pretext).

### 2.  Plaintiff's Prima Facie Case

To establish his prima facie case, Plaintiff lays out the following: first, Plaintiff engaged in protected activity by complaining to Chief Gaudett about the anonymous letters and second, his complaints made Defendant aware of his engagement in protected activity. Defendant concedes

the first point explicitly and the second implicitly (*see* Def.'s Mem. Supp. at 27), and so they will not be further addressed. To establish the third element, adverse employment action, Plaintiff points to the same six categories of employer activity that he used to support his hostile work environment claim, including *inter alia* failure to denounce the letters or investigate them, reduction in overtime, and stripping of responsibilities. Plaintiff then asserts that the temporal proximity between the protected activity and the retaliatory actions supports an inference of causation.

Recognizing that the burden of setting forth a prima facie case is *de minimis*, the Court's analysis of the summary judgment record will assume without deciding that the employment actions Plaintiff proffers could dissuade a reasonable worker from engaging in protected activity.

To establish causation at this stage, a Plaintiff may show "that the protected activity was followed closely by discriminatory treatment." *Hicks*, 593 F. 3d at 170. A review of the timeline shows that, while many of the employment actions claimed to be retaliatory are not temporally proximate to the complaints constituting protected activity, two adverse employment actions may follow closely enough to the protected activity to give rise to an inference of causation.

The Plaintiff's complaints constituting protected action occurred around the time of the March 26, 2012 and April 18, 2013 letters, which dates therefore set the parameters for measuring temporal proximity. A steady reduction in Plaintiff's overtime began in early 2013 and extended through at least 2014 (*see e.g.* Exs. 6, 7, and 8 to Pl.'s Mem. Opp'n.), commencing ten or eleven months after the first protected activity but prior to the second. The record does not provide the date on which vehicle take-home privileges were rescinded, so no assessment of any temporal proximity between the protected activity and the loss of this perk can be made. Similarly, Plaintiff does not establish when the afternoon and night training classes previously held at the training

academy were moved to the patrol room. (*See e.g.* Blackwell Tr. at 69:17-18 ("I don't know exactly the time frame on that")), and so the Court cannot assess any probative impact on the causation element. With respect to the Firearms Discharge Review Board, Lieutenant Blackwell applied for and was turned down from the firearms review board on or about March 1, 2013, one year after the first letter and a six weeks before the second letter—beyond a time period from which a causation inference could reasonably be drawn. (Armeno Aff. [Doc. # 31-7] ¶ 8.)

However, two instances of adverse employment action are closer in time to Lieutenant Blackwell's engagement in protected activity. The fitness classes Lieutenant Blackwell was not permitted to lead took place on July 29, 2013, three months after Lieutenant Blackwell complained of the second letter. In addition, Lieutenant Blackwell's deposition could be read to suggest that the selection of Lieutenant Gilleran to lead the firearms training occurred in May, 2013, one month after Plaintiff's protected activity. (*See* Blackwell Tr. at 75:2-23.)

### 3. Defendant's Rebuttal of Plaintiff's Prima Facie Case

To rebut Plaintiff's *prima facie* case, Defendant provides legitimate, non-discriminatory reasons for each of the purported adverse employment actions, focusing primarily on budget constraints that justify curtailment of take-home vehicle privileges, removal of overtime, assignment of teaching duties to avoid overtime expenses, and shifting training courses to police headquarters during first and third shifts. (Def.'s Mem. Supp. at 28-29.) Additionally, Defendant cites superior qualifications for the officer selected to run the fitness program. (*Id.*) The record supports these assertions. For the first eight months following Lieutenant Blackwell's complaint about the 2012 letter, the record is devoid of any purportedly retaliatory employment actions.

Assistant Police Chief James Nardozzi was hired on Nov. 27, 2012 with the explicit task of reducing overtime and controlling budget expenditures. After Assistant Chief Nardozzi arrived,

Plaintiff's overtime was cut: he was denied permission to work overtime during Storm Nemo in February of 2013, and these denials continued through at least the summer of 2014. Defendant's explanation that the transfer of afternoon and night classes from the training academy to the patrol room at police headquarters required no overtime because headquarters is open 24 hours a day is unrebutted. (Gaudett Aff. ¶¶ 48-50.) Similarly, the selection of Sergeant Collazo to lead the Cooper fitness classes incurred no overtime costs, consistent with the department's goal. (Gaudett Aff. ¶ 37). Assistant Chief Nardozzi's decision to take over approval of training courses increased efficiency by removing a layer of decision making and gave him direct control over training-related expenditures. (*See* Ex. 13 ("Nardozzi Tr.") to Opp'n. [Doc. # 40-12] Nardozzi Tr. at 11:6-12:11.) Cancellation of take-home car privileges also reduced budgetary expenditures. The proposal to separate in-service training from new recruit training, although never carried out, also targeted overtime expenses. (Nardozzi Tr. at 39:15-25.)  As a result of these measures, the departmental overtime budget was reduced from $8.02 million in fiscal year 2012/2013 to $5.26 million in fiscal year 2013/2014 (Gaudett Aff. ¶ 79), and Lieutenant Blackwell's overtime was reduced from $88,008 to $42,496. (Gaudett Aff. ¶ 78).

The one adverse employment action alleged to have followed closely on the protected activity that Defendant did not explain in terms of budget constraints was the selection of Lieutenant Gilleran to be in charge of firearms training. Plaintiff points to an email dispute in May 2013 (one month after Plaintiff's complaint about the second letter) about whether Lieutenant Gilleran would continue leading firearms training after spearheading the departmental transition from one kind of sidearm to another, as fixing the date on which the adverse employment action occurred. (*See* Nardozzi Tr. at 17:6-19:26; 21:8-22:13.) Defendant calls into question this characterization of the timing and suggests that the selection of Lieutenant Gilleran happened

earlier. Defendant explains that in 2012 BPD transitioned from one type of handgun to another; Lieutenant Gilleran, a certified firearms instructor, was selected to lead the transition. (Def.'s Mem. Supp. at 5.)  Since neither party specifies when in 2012 the transition occurred, no proximal relationship to any protected action can be shown. As Defendant points out, Lieutenant Gilleran remained in this position after the transition; he was not selected in May 2013 to lead firearms training. (*Id.*) Thus, it is incorrect for Plaintiff to say that this adverse employment action occurred in May 2013, in close temporal proximity to his second complaint.

### 4. Plaintiff's Attempt to Establish Pretext

While Plaintiff concedes that "temporal proximity alone cannot establish pretext" he nonetheless provides nothing beyond temporal proximity to show that Defendant's reasons are pretextual. (Pl.'s Opp'n. at 37). He explains that "prior to March of 2012, the plaintiff's work environment was tranquil. After his reaction to the blatant racial attack on him, his position and standing came under unceasing assault." (*Id.*) This assertion mischaracterizes the record, which contains insufficient evidence that any adverse employment action occurred in close temporal proximity to Plaintiff's March 2012 complaints. Rather, they began shortly after Assistant Chief Nardozzi was hired in November 2012 and continued throughout fiscal year 2012/2013. No evidence implies that curtailment of Plaintiff's overtime and other budget-cutting measures in the summer of 2013 were temporally connected with Plaintiff's complaints in April 2013, but rather to a pattern already set before the second letter was delivered.

"[W]ithout more . . . temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *El Sayed*, 627 F.3d at 933. In the instant case, Plaintiff's evidence of temporal proximity to adverse actions is insufficient, particularly in the absence of any other evidence from which a jury could find that the legitimate non-discriminatory reasons

proffered for Defendant's actions were mere pretext and that the adverse employment actions were motivated even in part by retaliatory animus for Plaintiff's complaints about the racially charged letters.

## III. Conclusion

For the reasons stated above, Defendant's motion for summary judgment is DENIED with respect to Plaintiff's allegations of unlawful discrimination (hostile work environment) in violation of Title VII and 42 U.S.C. § 1981 (Count One and part of Count Three) and GRANTED with respect to Plaintiff's allegations of unlawful retaliation under Title VII and 42 U.S.C. § 1981 (Count Two and the retaliation claim in Count Three).

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of February 2017.